UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
**MICHAEL E. LACHANCE,**                )
                                        )         **CIVIL ACTION**
       **Plaintiff,**          )
                                        )         **NO. 17-10480-TSH**
       v.                     )
                                        )
**TOWN OF CHARLTON, a Municipal**       )
**corporation And Officers TIMOTHY A.** )
**SMITH, SGT. KEITH R. CLOUTIER and**   )
**JASON F. WHITE,**                     )
                                        )
       **Defendants.**         )
_____ )

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 22)**

**March 21, 2019**

**HILLMAN, D.J.**

Michael E. Lachance ("Plaintiff") brought this claim alleging unreasonable use of force pursuant to 42 U.S.C. § 1983 (Count I), assault and battery (Count II), a *Monell* claim against the Town of Charlton (Count III), negligence (Count IV), and violations of the Americans with Disabilities Act, 42 U.S.C. § 12131, (Count V). Defendants filed this motion for summary judgement on all claims. For the reasons stated below, Defendants' motion is ***granted*** in part and ***denied*** in part.

**Background**

This Court's review of the record is in the light most favorable to the party opposing summary judgment. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir. 2000).

On January 4, 2014, Kimberly Lachance awoke in the middle of the night and called 911 because the Plaintiff, her husband, was gasping for air. Plaintiff was shaking and had rolled out of bed onto the floor. He was unresponsive and a substance was coming from his mouth. When officers arrived they attempted to stop Plaintiff from moving and administer oxygen, but Plaintiff resisted. Plaintiff then attempted to leave his apartment; he was flailing his arms and was highly agitated. The officers threw Plaintiff onto a La-Z-Boy sofa, which toppled over backwards, and Plaintiff landed on his back and shoulder. One officer fell on top of Plaintiff and a "swarm" of others quickly jumped on top of him. An officer placed his knee in the center of Plaintiff's back and then placed two sets of handcuffs on Plaintiff. Officers also used a leg-lock technique to prevent Plaintiff's kicking. Plaintiff repeatedly hit his head against the hardwood floor, so officers initially attempted to stop Plaintiff with their hands and then placed a pillow under his head. Eventually, Plaintiff was put on a stretcher. While in the ambulance, Plaintiff was kicking, thrashing, and hitting everyone around him. He struggled against the handcuffs so much that they cut his wrists open.

Plaintiff eventually arrived at UMass Memorial Medical Center where he was diagnosed with cluster seizures. Mrs. Lachance observed bruising and abrasions on Plaintiff at the hospital resulting from the altercation with officers. Similarly, Plaintiff's son observed that his father had cuff marks, deep cuts on his wrists, and bruising all over his back, ribs, and shoulders. Plaintiff suffered a thoracic T4-T5 compression fracture from being pushed over the couch which caused back pain for over a year after the incident.

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the nonmoving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005), *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).  Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

### 1. Constitutional Claims
#### a. Excessive Force (Count I)

Section 1983 provides a private right of action against a person who, under the color of state law, deprives someone of "any rights, privileges, or immunities secured by the Constitution

and [federal] laws." 42 U.S.C. § 1983. In order to state a claim under section 1983, "the plaintiff must show a deprivation of a federally secured right." *Harrington v. City of Nashua*, 610 F.3d 24, 28 (1st Cir. 2010). Plaintiff's section 1983 claim is premised on the allegation that Defendants used excessive force while restraining him.

Defendants argue that they are entitled to qualified immunity. The First Circuit has adopted a two-part test to assess qualified immunity. A court must consider: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (citation omitted).

The second prong of the test is itself has two aspects. "One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation." *Id.* Thus, in order "[t]o overcome qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987)). The second aspect "focuses more concretely on the facts of the particular case." *Id.* Thus, a court must assess "whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.* Importantly, "this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quotation marks and citation omitted); *see also City of Escondido v. Emmons*, 139 S.Ct. 500, 504 (2019) (per curiam) (noting "the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018))). In short, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."

*Maldonado*, 568 F.3d at 269. "This latter step is designed to achieve a prophylactic purpose: if affords some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct." *Gray v. Cummings*, 2019 WL 851351, at *5 (1st Cir. Feb. 22, 2019) (quotation marks and citation omitted).[1]

### b. Whether the Facts Make Out Violation of a Constitutional Right

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (citing U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S.Ct. 1865 (1989)). The Fourth Amendment is implicated when an officer uses "excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham*, 490 U.S. at 395, 109 S.Ct. 1865.[2] Excessive force is assessed "according to the constitutional touchstone of objective reasonableness, so we do not consider an officer's subjective "intent or motivation." *Raiche*, 623 F.3d at 36 (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). Accordingly, to prevail, "a plaintiff must show that the defendant employed force that was unreasonable under all

---

[1] The First Circuit has recognized the inherent difficulties applying the qualified immunity framework at the summary judgment stage. *See Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009) ("The difficulty arises because the summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality), whereas qualified immunity, when raised on summary judgement, demands deference to the reasonable, if mistaken, actions of the movant."). To resolve this tension, the First Circuit instructs courts to "first identify[] the version of events that best comports with the summary judgement standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Id.* at 19; *see also Saucier v. Katz*, 533 U.S. 194, 200 (2001) ("A court required to rule on the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

[2] I find that Plaintiff was seized and therefore triggered his Fourth Amendment right to be free from excessive force triggered. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.").

the circumstances." *Morelli*, 552 F.3d at 23 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989)).

"Our starting point is the question of whether a reasonable jury could find that [Defendants] violated [Plaintiff's] Fourth Amendment rights through the use of excessive force." *Gray*, 2019 WL 851351, at *3. The Court in *Graham* noted that while "the test of reasonableness under the Fourth Amendment is not capable of precise definition . . . its proper application requires careful attention to the facts and circumstances of each particular case." 490 U.S. at 396, 109 S.Ct. 1865 (quotation marks and citation omitted). To assist courts in considering the facts most relevant to a reasonableness determination, the Court instructed courts to consider: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.[3]

---

[3] Defendant argues that the *Graham* factors are ill-suited to assess the reasonableness of force used in a medical emergency. Instead, Defendant urges the Court to adopt the standard adopted by the Sixth Circuit in *Estate of Hill by Hill v. Miracle*, 853 F.3d 306 (6th Cir. 2017). In *Hill*, the court concluded:
> [A]pplying the *Graham* factors to the [medical emergency] that Miracle faced is equivalent to a baseball player entering the batter's box with two strikes already against him. In other words, because Hill had not committed a crime and was not resisting arrest, two of the three *Graham* factors automatically weighted against Miracle. The key problem is that the district court tried to apply the *Graham* factors to a completely different factual situation—a medical emergency—where there was no crime, no resisting of arrest, and no direct threat to the law-enforcement officer. In doing so, the court failed to see the forest (the overall standard of objective reasonableness) for the trees (the three factors to use as an aid in assessing objective reasonableness in the typical situation).

*Id.* at 313. Accordingly, the *Hill* court offered a different set of questions to serve as a guidepost when considering the objective reasonableness of force used during a medical emergency:
> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

*Id.* at 314. "If the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity." *Id.*

I find that a jury could reasonably find that officers utilized excessive force when restraining Plaintiff. In *Gray*, the First Circuit held that a reasonable jury could find that an officer who used a taser to restrain a mentally ill person not suspected of a crime used excessive force. *Gray*, 2019 WL 851351, at *4. Regarding the first *Graham* factor, the court noted that "we think it important that [the officer] was not called to the scene to investigate a crime; he was there to return a person suffering from the hospital. When the subject of a seizure has not committed any crime, the first *Graham* factor ordinarily cuts in the subject's favor." *Id.* (citing *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016)). Here, like in *Gray*, officers were not called to the scene to respond to a reported crime. Accordingly, the first *Graham* factor cuts against Defendants.

Regarding the second factor—whether Plaintiff posed an immediate threat to the safety of Defendants or others—the *Gray* court noted that the plaintiff was involuntarily committed pursuant to Mass. Gen. Laws ch. 123, § 12, based on a determination by a qualified medical professional that "failure to hospitalize [her] would create a likelihood of serious harm by reason of mental illness." *Id.* § 12(a). However, the court noted:

> It is also true that Cummings knew as much. Although a jury could supportably find on these facts that Cummings reasonably believed that Gray posed a danger to him, it could supportably find instead that Gray—who was shuffling down the sidewalk barefoot and unarmed—only posed a danger to herself (especially given Cummings's distinct height and weight advantage).

---

The First Circuit, however, has applied the *Graham* factors where officers used force restraining a mentally ill person not suspected of a crime. *See Gray*, 2019 WL 851351, *4. If the *Graham* factors were properly applied in that case, they are also appropriate here. Further, while the *Hill* court argued that it is inappropriate to force officers to enter the batter's box with two strikes already against them, where a person is not suspected of any crime and not a threat to officers or others, any force used by officers is inherently less reasonable. Therefore, in situations where there is no indication of wrongdoing and no threat to the safety of others, one swing by an officer may be enough to fairly call him out.

7

*Gray*, 2019 WL 851351, at *4. Similarly, here, Defendants knew they were responding to a medical emergency. Plaintiff was in his own home, undressed and unarmed. Further, Plaintiff was even less likely to pose a threat to officers than the plaintiff *Gray*, as Plaintiff was experiencing a medical emergency rather than suffering from mental illness. And while Cummings had a distinct height and weight advantage over Gray, Defendants here had a distinct advantage in numbers. At least three officers were on the scene to restrain Plaintiff, which mitigated the already small risk that he posed a threat to them.

The final *Graham* factor—whether Plaintiff was actively resisting arrest—favors Defendants. The record unquestionably supports that Plaintiff resisted officers' efforts to restrain him. Thus, like in *Gray*, "the *Graham* factors point in conflicting directions. Seen through the prism of the totality of the circumstances the evidence is subject to interpretation and can support plausible though inconsistent inferences." *Id.* At this stage in the litigation, however, the Court must draw those inferences in Plaintiff's favor. A reasonable juror could conclude that throwing a person—who is not suspected of committing a crime or a threat to officers—over a sofa with enough force to break his back, and then using the dangerous restraint technique of kneeling on his back, is an excessive use of force. *See, e.g.*, *Morelli*, 552 F.3d at 23 (finding triable excessive force claim where officer slammed plaintiff against wall who, "at worst, was suspected of being a petty thief"); *Alexis v. McDonald's Rests. of Mass., Inc.*, 67 F.3d 341, 353 (1st Cir. 1995) (holding jury could find excessive force where officer "violently grabbed and pulled [plaintiff] from the booth and across the table, handcuffed her hands tightly behind her back, and, with the help of Officer Fuer, dragged her from the booth" to effectuate arrest for trespassing in public restaurant).

    c.  *Whether That Right Was Clearly Established*

The First Circuit has found that kneeling on the back of a restrained person is unreasonable. In *McCue v. City of Bangor, Maine*, for instance, the court noted that "it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 838 F.3d 55, 64 (1st Cir. 2016) (quotation marks and citation omitted)[4]; *see also Weigel v. Broad*, 544 F.3d 1143, 1152, 1155 (10th Cir. 2008) (holding officer not entitled to qualified immunity at summary judgment stage where he applied pressure to detainee's back for "about three minutes" after hands and feet had been restrained and noting "the law was clearly established that applying pressure to [a person's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions"); *Abdullahi v. City of Madison*, 423 F.3d 763, 765 (7th Cir. 2005) (holding officer not entitled to qualified immunity at summary judgement where an officer, for 30 to 45 seconds, "placed his right knee and shin on the back of [a person's] shoulder area and applied his weight to keep [the person] from squirming or flailing" despite the fact that the detainee had "arch[ed] his back upwards as if he were trying to escape" because it may have instead been "a futile attempt to breath"); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (holding officers violated the plaintiff's Fourth Amendment right to be free from excessive force by pressing their weight against the torso and neck "after he was 'knock[ed] . . . to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach'" (alterations in original)). Therefore, "as the abundant case law demonstrates, a jury could find that

---

[4] Like Plaintiff here, the plaintiff in *McCue* was also not suspected of a crime. In that case, officers "sought to bring McCue into protective custody due to his erratic behavior believed to be caused by ingestion of bath salts. In an attempt to restrain McCue, who initially resisted, the officers placed McCue in a face-down, prone position for a disputed period of minutes while two officers exerted weight on his back and shoulders." *McCue*, 838 F.3d at 56.

a reasonable officer would know or should have known about the dangers of exerting significant pressure on the back of a prone person, regardless of any lack of formal training." *McCue*, 838 F.3d at 65.[5] Accordingly, I find it was clearly established that Plaintiff had a constitutional right to be free from an officer kneeling on his back after he had been restrained.

The second aspect of the clearly established prong requires the Court to assess "whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right." *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 141 (1st Cir. 2001). "It is not always evident at the time an official takes an action that a clearly established right is involved. For example, the factual situation might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult." *Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 61 (1st Cir. 2004). Here, there is a genuine dispute whether an officer put his knee on Plaintiff's back. Moreover, it is unclear from the record how long officers exerted weight on Plaintiff's back or whether they stopped after his hands and feet were restrained. At this stage, disputes must be resolved, and inferences must be drawn, in Plaintiff's favor. *See In re Varrasso*, 37 F.3d 760, 763 (1st Cir. 1994) ("This means, of course, that summary judgement is inappropriate if inferences are necessary for the judgement and those inferences are not mandated by the record."); *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 488 (1st Cir. 1992) (noting that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference form the

---

[5] While officers in these cases were not presented with a plaintiff experiencing a seizure, "a First Circuit case presenting the same set of facts is not necessary to hold that defendants had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive." *McCue*, 838 F.3d at 64; *see also Hope v. Pelzer*, 536 U.S. 730, 74, 122 S.Ct. 2508 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219 (1997) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." (quotation marks and citation omitted)).

'totality of the circumstances' revealed by the undisputed evidence"). Thus, for the purposes of this motion, I find a reasonable officer would have been aware that his actions violated the constitutional right established by the abundant caselaw noted above.

Plaintiff's most serious injury, however, seems to have occurred from being pushed over the couch and not from an officer kneeling on his back. *See* Docket No. 25-9, 12-15.[6] Therefore, the Court is faced with the question of whether it should assess the force used by officers with respect to each discrete act or in its entirety. If the Court assesses the push over the couch separately from the knee to the back, and if the push is found to have been reasonable, it would have consequences for Plaintiff's recovery.

The First Circuit has viewed excessive force claims both by analyzing the entire event and focusing on discrete, excessive acts. In *Alexis*, for instance, the First Circuit, viewing the record in the plaintiff's favor at the summary judgment stage, reversed the district court's grant of qualified immunity on an excessive force claim where

> Leporati suddenly and violently grabbed and pulled [the plaintiff] from the booth and across the table, handcuffed her hands tightly behind her back, and, with the held of Officer Fuer, dragged her from the booth, bruising her legs in the process. . . . Alexis asked the officers to allow her to walk out. Instead, they hoisted her by her elbows and carried her from the restaurant to the police car, where Leporati pushed her into the car with the instruction, "Get your ass in there."

---

[6] Plaintiff's medical expert opined:
> To a reasonable degree of medical certainty Mr. Lachance suffered a number of traumatic injuries as state above in the medical records. The most significant one was an acute compression fracture of T4-T5 which in my opinion was directly caused when Mr. Lachance was thrown/pushed against the recliner with force. That force/momentum caused his body and spine to change direction from a fix [sic] position and from the usual force of gravity from top to bottom creating axial compression of his spine at T4-T5.
> Secondly, the initial impact that occurred from being pushed into the recliner was strong enough to cause the recliner to flip resulting in additional forces as the spine changed position accelerating/decelerating until the recliner flipped causing his thoracic spine to fail at the weakest point of T4-T5 during that process.

(Docket 25-9, at 14).

67 F.3d 341, 346 (1st Cir. 1995). On the other hand, in *Jennings*, the First Circuit seemed to confine its focus to a singular, excessive act. In that case, Jennings initially resisted arrest, which required the use of force by officers to subdue him. During the ensuing struggle, Officer Jones used an "ankle turn control technique." 499 F.3d at 3-4. The officer's use of the "ankle turn control technique" caused Jennings considerable pain. Jennings then told Jones that the "ankle turn" was hurting his previously injured ankle. Jones then increased the force he was using and broke Jennings' ankle. *Id.* at 5. The First Circuit held that Jones violated the plaintiff's Fourth Amendment right to be free from "excessive force by increasing pressure on Jennings' ankle after Jennings stopped resisting for several seconds and state that Jones was using force that hurt his previously injured ankle." *Id.* at 15-16; *see also Rush v. City of Lansing*, 644 Fed.Appx. 415 (6th Cir. 2016) (assessing officer's entitlement to qualified immunity with respect to each of the two shots fired and finding that "it was not unreasonable for [the officer] to perceive Clay as still posing a threat when he fired the second shot").

I find that under the facts of this case the better approach is the segmented analysis used by the courts in *Jennings* and *Rush*. In fact, the *Alexis* court might have also used a segmented approach because every "segment" of the altercation in that case arguably involved excessive force. Here, just as the plaintiff in *Jennings* had a right to be free from an ankle-lock after he stopped resisting, Plaintiff had a clearly established right to be free from an officer kneeling on his back after he had already been restrained. Also like in *Jennings*, however, Plaintiff's own actions might have initially "require[ed] the use of force by state police officials to subdue him." *Jennings*, 499 F.3d at 3. Accordingly, the initial push may have been a reasonable use of force.[7]

---

[7] Some courts, however, view police encounters in their entirety when assessing excessive force. For instance, in *Rasmussen v. City of New York*, 766 F.Supp.2d 399, 405 (E.D.N.Y. 2011), upon encountering the plaintiff, who was passive with his arms raised, bludgeoned him in the face with his gun. The court concluded:

12

Therefore, I will also assess whether it was clearly established that throwing Plaintiff over his sofa was a violation of his clearly established constitutional right to be free from excessive force. I find that, insofar as Plaintiff's claim is predicated on officers forcefully[8] pushing him, the officers are entitled to qualified immunity. "Not every push or shove" constitutes excessive force "even if it may later seem unnecessary in the peace of a judge's chambers." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolution—about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865. In addition, Plaintiff has

> not brought to our attention any cases of controlling authority in [his] jurisdiction at the time of the incident which clearly established the rule on which [he] seek[s] to rely, nor ha[s he] identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.

*Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692 (1999).[9] In fact, precedent in the First Circuit suggests that forcefully pushing a resistant plaintiff to the ground is not excessive. *Compare*

---

> [I]f excessive force was used against Ivan as the first encounter, it could also influence the determination of whether the force used to handcuff Ivan thereafter was excessive. Stated otherwise, the use of excessive force in greeting a suspect with a gratuitous attack might render the use of force in handcuffing a suspect excessive, even if that same force used in applying the handcuffs would not be excessive if viewed in insolation, because the additional difficulty in applying the handcuffs and the force required to do that could be the direct result of the excessive force use in attacking him.

*Id.* That said, the order of events in this case is different than in *Rasmussen*. In that case, the initial force was excessive. Here, it was the later force. Thus, while it makes sense that the initial, excessive force in *Rasmussen* informs the assessment of later uses of force, that proposition makes less sense in this case.

[8] The amount of forced with which officers pushed Plaintiff seems to be an issue of disputed fact. For the purposes of this motion, I will assume that officers "used a lot of force." (Docket No. 25-1, at 88:8-12).

[9] The Court has only identified caselaw outside of the First Circuit that might support Plaintiff's position. For instance, in *Smith v. City of Troy, Ohio*, the plaintiff experienced a seizure while driving, drove his car into a yard, and then exited the car and began walking down the road. 874 F.3d 938, 942 (6th Cir. 2017). A neighbor called the police who arrived on the scene to the plaintiff grasping a chain-link fence with his pants around his knees. *Id.* A struggle ensued to control the plaintiff where police officers used a leg sweep to take the plaintiff to the ground and subsequently deployed a taser eight times. *Id.* Refusing to grant the defendants summary judgement on an excessive force claim, the court concluded that viewing the record in the light most favorable to the plaintiff, "that Deputy Osting violated Smith's right to be free from

*Therrien v. Town of Jay*, 483 F. Supp. 2d 19, 26-27 (D. Me. 2007) (granting qualified immunity for forceful takedown after lengthy car chase where arrestee ignored numerous orders to stop, was clearly intoxicated, and generally acted in an "irrational and unpredictable fashion") *with Ciolino v. Gikas*, 861 F.3d 296, 303-306 (1st Cir. 2017) (declining to grant immunity where officer threw the plaintiff to the ground with enough force to tear his rotator cuff and the plaintiff "showed no inclination to resist arrest or to attempt to flee from arrest"); *Jacobson v. City of Nashua*, 2002 WL 1349515, at *4 (D.N.H. June 19, 2002) ("[T]he use of such force on a person sitting passively who complies immediately with a command to show his hands—and who is not reasonably though to be armed—is unreasonable."). Accordingly, I find that officers did not violate Plaintiff's clearly established rights by pushing him over the sofa.[10, 11]

Therefore, I conclude that Plaintiff's excessive force claim survives insofar as it is based on officers kneeling on his back. Although Plaintiff's most serious injury was a result of being pushed over the sofa, the record demonstrates that some additional injuries may have resulted from

---

excessive force when he took Smith to the ground with a leg sweep and landed on top of Smith. There is little in the record to suggest that Smith committed any crime, even a minor one." *Id.* at 944-45.

[10] It is also true "that where an officer's conduct is such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." *Assoc. de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60-61 (1st Cir. 2008). This is not, however, such a case.

[11] Plaintiff also notes that the officers all had at least some training in how to handle a person experiencing a seizure. (Docket No. 30, ¶¶ 5, 32-33, 42). The First Circuit has approved taking such training into consideration when deciding whether a Fourth Amendment violation occurred. *See, e.g.*, *Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016) ("We have approved the taking of evidence about police training and procedures into consideration."); *Fernández-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 327 (1st Cir. 2015) (considering "standard police practice"). Importantly, however, training protocols are only relevant to the first prong (where I found for Plaintiff) and the second aspect of the second prong (which he does not reach). *See Jennings*, 499 F.3d at 19-20 ("Officer Delaney's testimony about the training that officers receive . . . is relevant both to the prong one question . . . and to the prong three question . . . of whether a reasonable officer in Jones' circumstances would have believed that his conduct violated the Constitution."). For one, it is not clear what the training entailed or whether officers' conduct violated the established protocols. More importantly, Plaintiff's claim fails at the first part of the second prong— whether his right was clearly established. Protocols cannot establish constitutional rights. *See Stamps*, 813 F.3d at 32 n.4. ("Such standards do not, of course, establish the constitutional standard.").

officers kneeling on him. *See* Docket No. 25-9, at 10 (noting "paravertebral bruising mid back consistent with compression due to restraining").[12]

### d. Monell Claim (Count III)

The Court does not find it beneficial to undertake an analysis of Plaintiff's *Monell* claims at this point because it is the Court's intent to bifurcate the trial. The Section 1983 claim against the individual officers will be tried first. If the jury finds that one or more of the individual officers committed a constitutional violation, the Court will schedule a separate trial on the *Monell* claims. Prior to such trial, the Court will likely permit the parties to file dispositive motions on such claim.

### 2. State Law Claims

### a. Assault and Battery (Count II)

Under the Massachusetts Torts Claims Act ("MTCA"), "[i]ndividuals . . . are not shielded from liability in their personal capacities for intentional torts they commit." *T.K. v. Town of Barnstable*, 2018 WL 3748166, at *7 (D. Mass. Aug. 6, 2018); *see also McNamara v. Honeyman*, 406 Mass. 43, 546 N.E.2d 139, 142 (1989) ("Section 10, which provides for exemptions from operation of § 2, among others, states in pertinent part that a public employee shall *not* be immune from 'any claim arising out of an intentional tort.'" (emphasis in original)); Mass. Gen. Laws ch. 258, § 10(c). Therefore, because Defendants are not shielded from liability, I must assess whether Plaintiff has plausibly stated a claim.

Assault and battery is the "intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing

---

[12] Further, even if Plaintiff cannot prove an injury, he may be entitled to nominal damages if he can demonstrate that he was deprived of a constitutional right. *See Memphis Cmty. Sch. Dist. V. Stachura*, 477 U.S. 299, 308 n.11, 106 S.Ct. 2537 (1986) ("[N]ominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury.").

personal injury to another." *Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996) (quoting *Commonwealth v. McCan*, 277 Mass. 199, 203, 178 N.E. 633, 634 (1931)). "[A]n officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest." *Julian v.* Randazzo, 380 Mass. 391, 396, 403 N.E.2d 931 (1980). Massachusetts law, however, allows for assault and battery claims against officers who use excessive force. *See Powers v. Sturtevant*, 1999 Mass. 265, 85 N.E. 84, 84 (1908) (holding that defendant officer "had not the right to use unreasonable or excessive force and if he did, he is liable to the plaintiff for any injury suffered in consequence thereof"). The standard for determining whether force is reasonable for an assault and battery claim is "essentially the same" as the standard for determining whether it is reasonable for excessive force claims. *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991). Accordingly, "[w]here a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims." *Raiche*, 623 F.3d at 40 (citation omitted).

Defendants argue that because Plaintiff's claims for excessive force should be dismissed so too should his claims for assault and battery. However, because I have found that a reasonable jury could find that the force used by officers was unreasonably excessive, Plaintiff's assault and battery claim survives this motion.[13]

### b. Negligence (Count IV)

---

[13] The First Circuit has noted that "Massachusetts law is unsettled regarding the existence of a state-law concept analogous to federal qualified immunity." *Raiche*, 623 F.3d at 40 (citing *Foster v. McGrail*, 844 F. Supp. 16, 29 (D. Mass. 1994)). Defendants only argue, however, that because their force was not excessive, Plaintiff's assault and battery claim fails. *See* Docket No. 23, at 8. Thus, because Defendants do not argue they are entitled to qualified immunity for the common law claims, this Court need not address the existence of state qualified immunity.

The MTCA provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." Mass. Gen. Laws ch. 258, § 2. A municipality may be held liable pursuant to this provision for the negligence of its officers. *See Lewis v. Kendrick*, 944 F.2d 949, 953 (1st Cir. 1991).

Defendants contend that none of them were negligent in restraining Plaintiff. According to Defendants, "doing nothing and allowing [Plaintiff to] injure himself or injure others would have been far more negligent." (Docket No. 23, at 8-9). Defendants imply a false dilemma between negligently restraining Plaintiff or doing nothing. Of course, there were additional possibilities that Defendants do not acknowledge. Because this is Defendants' only argument for summary judgement, and because it is unconvincing, Count IV survives Defendants' motion.

### 3. ADA Claim (Count V)[14]

To state a claim under Title II of the ADA, a plaintiff must demonstrate:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000). Further, in the context of a wrongful arrest, other circuits have permitted claims to proceed on two general theories: "(1) where the police wrongfully arrest someone with a disability because they misperceive the effects of that disability as criminal activity and (2) where police fail reasonably to accommodate a person's disability during the investigation or arrest, causing the person to suffer greater injury than

---

[14] Defendants move for summary judgement with respect to both ADA claims against individual Defendants and against the Town of Charlton. In Plaintiff's opposition brief, he clarifies that his ADA lies solely against the Town. Therefore, I will not address Defendants' arguments that there is no individual liability under the ADA.

17

otherwise would occur." *Montae v. Am. Airlines, Inc.*, 757 F. Supp. 2d 47, 52 (D. Mass. 2010) (citing *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 179 (D. Me. 2009); *see also Cohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999).

Plaintiff has not demonstrated that he has a disability within the meaning of the ADA. The First Circuit has adopted a three-party test to determine whether an impairment constitutes a disability under the ADA:

> First, the plaintiff must establish that he suffers from a physical or mental impairment. Second, he must demonstrate that it affects life activities that are major, i.e., of central importance to daily life. Major life activities are basic activities of daily life than an average person in the general population can perform with little or no difficulty—functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, leaning, and working. Finally, he must show that the impairment substantially limits the identified major life activity.

*Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011) (quotation marks and citations omitted). Assuming Plaintiff suffers from epilepsy,[15] which the First Circuit has recognized can be an impairment, *see id.*, he must still demonstrate that this impairment affects a major life activity. In *Ramos-Echevarria*, the First Circuit held that a plaintiff with epilepsy could not demonstrate that his impairment affected a major life activity. *Id.* at 188-90. While *Ramos-Echevarria* is not dispositive as these determinations are inherently "an individualized inquiry," *id.* at 188, Plaintiff has also failed to make this showing. Indeed, Plaintiff has presented no evidence that he is epileptic or that his condition affects his life in a way that would constitutive a disability within the meaning of the ADA. Accordingly, I find that Plaintiff has not satisfied his burden of demonstrating that he is entitled to relief under the ADA.

---

[15] Plaintiff's counsel implies at several places in the record that Plaintiff suffers from epilepsy. *See, e.g.*, Docket No. 30, at 2 ("Smith believed that epilepsy or seizures is a disability."). This is, however, far from certain. Plaintiff's medical examination "did not show a likely seizure focus." (Docket No. 30-6, at 3). In addition, before this incident, Plaintiff had "no past medical history of seizure disorder or seizure risk factors." *Id.* at 11.

## **Conclusion**

For the reasons stated above, Defendants' motion is ***granted*** in part and ***denied*** in part.

(1) Count I survives the motion insofar as it is based on officers kneeling on Plaintiff's back.

(2) Defendants are not entitled to summary judgement on Count II.

(3) The Court will defer analysis of Count III.

(4) Defendants are not entitled to summary judgement on Count IV.

(5) Defendants are entitled to summary judgment on Count V.

**SO ORDERED**

> ***/s/ Timothy S. Hillman***
> **TIMOTHY S. HILLMAN**
> **DISTRICT JUDGE**